```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:_____           │
│ DATE FILED:___2/5/2021_____    │
└─────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Damari Vicens,**

                              **Plaintiff,**

               -against-

**Commissioner of Social Security,**

                              **Defendant.**

**1:19-cv-10743 (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

On November 20, 2019, Plaintiff Damari Vicens ("Plaintiff" or "Vicens") filed this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB"). (Compl., ECF No. 1.) Presently before the Court are Plaintiff's motion for judgment on the pleadings (Pl.'s Notice of Mot., ECF No. 14) and the Commissioner's cross-motion for judgment on the pleadings. (Comm'r Notice of Mot, ECF No. 20.) For the reasons set forth below, Plaintiff's motion is DENIED and the Commissioner's cross-motion is GRANTED.

**BACKGROUND**

**I.      Procedural History**

On January 19, 2016, Vicens applied for DIB[1] with a disability onset date of May 9, 2013. (Administrative Record, ECF No. 10 ("R."), 83, 127.) The Social Security Administration ("SSA") denied her application on April 22, 2016, and Vicens requested a hearing before an

---

[1] To qualify for disability insurance benefits, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (c); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI"). Vicens's DLI is June 30, 2018. (R. 83.)

Administrative Law Judge ("ALJ"). (R. 137-41, 143.) A hearing was held before ALJ Anne Sharrard on September 25, 2018. (R. 100-25.) In a decision dated November 16, 2018, ALJ Sharrard found that Vicens was not disabled. (R. 83-94.) On January 11, 2019, Vicens requested review of the ALJ's decision by the Appeals Council. (R. 246-48.) ALJ Sharrard's decision became the Commissioner's final decision when the Appeals Council denied Vicens's request for review on September 24, 2019. (R. 68-71.) This action followed.

## II.    Non-Medical Evidence

Vicens was born on November 14, 1963 and was 54 years old on the DLI. (R. 92.) She grew up and completed high school in the Dominican Republic and then came to the United States in 1997. (R. 109.) She had past work as a sales associate, maintenance worker and home health aide. (R. 111-13, 120-21, 282.)

## III.    Medical Evidence During Relevant Period[2]

### A.    RYC Orthopaedics

On May 9, 2013, Vicens saw Eric Behrens, a physician's assistant ("PA") at RYC Orthopedics. (R. 406-08.) Vicens complained of neck pain and thoracic spine pain. (R. 408.) She further stated that the pain had worsened over the previous week due to heavy lifting that occurred at work. (*See id*.) PA Behrens observed that Vicens had forward flexion to 30 degrees, extension to 10 degrees, right and left lateral bending to 10 degrees, full strength in her distal extremities and no loss of sensation. (*See id*.) X-rays of the thoracic spine showed mild

---

[2] The relevant period is from the May 9, 2013 alleged onset date through the June 30, 2018 DLI.

degenerative joint disorder. (*Id*.) PA Behrens gave Vicens a prescription for physical therapy and 500 mg of Naprosyn.[3] (*Id*.)

### B.   Tender Loving Care Physical Therapy

On May 14, 2013, Vicens attended an initial physical therapy assessment with Jorge Llaurado,[4] a physical therapist ("PT") at Tender Loving Care Physical Therapy, for evaluation and treatment of the thoracic spine. (R. 378-81, 402-05.) She complained of stiffness in the morning, inability to sleep through the night without waking up due to pain, difficulty turning and bending the upper truck in all directions and difficulty with daily activities and tasks. (R. 378, 402.) Vicens described the pain as dull and constant that increased with activities involving the use of the thoracic spine. (*See id*.) She further noted that she had a work-related injury on September 18, 2012 and that she went to the emergency room on April 30, 2013 due to severe pain and was advised to establish a worker's compensation case. (*Id*.)

After completing the initial assessment, PT Llaurado found that Vicens had "excellent rehabilitation potential with attainable functional improvement." (R. 380, 404.) PT Llaurado observed that Vicens had a decreased range of motion of the thoracic spine; diminished muscle strength in the thoracic spine and scapula;[5] increased tenderness and tightness along the thoracic spine; pain; a normal gait; and normal C-5, C-6, C-7, L-4 and S-1 reflexes. (R. 380-81, 403-04.)

---

[3] "Naprosyn is brand name preparation of naproxen, a nonsteroidal anti-inflammatory drug recommended for use in relieving the symptoms of rheumatoid arthritis or osteoarthritis." *Mushtare v. Astrue*, No. 06-CV-01055 (LEK) (VEB), 2009 WL 2496453, at *6 n.12 (N.D.N.Y. Aug. 12, 2009) (citation omitted).

[4] Plaintiff identifies the examiner as Dr. Capeci (*see* Pl.'s Mem., ECF No. 18, at 3), but the record reflects that Dr. Capeci was the referring provider and PT Llaurado was the examiner. (R. 378, 381, 402, 405.)

[5] "The scapula is commonly referred to as the 'shoulder blade.'" *Rodriguez v. Astrue*, No. 02-CV-01488 (BSJ) (FM), 2009 WL 1619637, at *4 n.13 (S.D.N.Y. May 15, 2009).

On June 30, 2014, Vicens saw PT Llaurado for a re-evaluation due to lumbar spine and cervical spine pain. (R. 428-33.) PT Llaurado noted that Vicens had attended 13 treatment sessions since a therapy evaluation on May 6, 2014. (R. 428.) PT Llaurado assessed that Vicens presented with decreased range of motion of the lumbar spine and cervical spine; decreased muscle strength in the trunk, lower extremities, cervical spine and upper extremities; difficulty ambulating; decreased postural awareness; and pain while performing activities of daily living and light housework. (R. 428, 432.) PT Llaurado concluded that Vicens demonstrated a good response to physical therapy and demonstrated improvement in exercise tolerance, functional activities, range of motion and strength. (R. 431.) PT Llaurado found that she was a good candidate to restore functional abilities. (*Id*.)

### C.    Dr. Douglas A. Schwartz

Vicens received medical care from Dr. Schwartz, a physical medicine and rehabilitation specialist, between June 17, 2013 and June 5, 2015. (R. 362-63, 409-26, 475.) Vicens first visited Dr. Schwartz on June 17, 2013 for an initial evaluation following a work accident while working as a home health aide. (R. 417.) She had attempted to transfer her patient from wheelchair to bed, resulting in an immediate onset of severe pain. (*Id*.) Vicens complained of persistent pain and stiffness to the neck and low back, mainly on the right side; numbness and tingling into the right arm and leg; pain to the middle back; tightness and spasms to all these areas; and difficulty with daily activities and tasks. (*Id*.)

On the visual analogue scale ("VAS"), Vicens marked 50 mm, out of a possible 100 mm, as the point representing the perception of her current state of pain. (R. 417.) She reported that she

was taking Relafen[6] for pain management and Flexeril[7] for muscle spasms, both of which had been prescribed by another physician. (*Id*.) Dr. Schwartz observed pain reproduced on palpation of the bilateral cervical/lumbosacral paraspinal trigger points and spasms extending to the bilateral trapezii and upper gluteal regions, and on palpation of the bilateral thoracic paraspinals. (*Id*.) The pain reproduced was greater on the right side than left side. (*Id*.)

Dr. Schwarz diagnosed derangements of the cervical, thoracic and lumbosacral spines with probable underlying radiculopathy,[8] myofasciitis[9] and disc pathology. (R. 418.) He recommended physical therapy 2-3 times a week, along with other weekly exercises and conditioning, and electroacupuncture 1-2 times per week to help control exacerbations of her symptoms. (*Id*.) Dr. Schwartz stated that Vicens should maintain taking Relafen and Flexiril as prescribed by the other physician. (*Id*.) He noted that Vicens was totally disabled from any and all work and that there was a causal relationship between the history of the injury described by Vicens and the diagnosis. (*Id*.)

Vicens returned for follow-up evaluations with Dr. Schwartz on January 6, 2014, April 30, 2014 and July 2, 2014. (R. 409, 411, 421.) She complained of pain in the same areas as her initial

---

[6] "Relafen is the brand name for a preparation of nabumetone, a nonsteroidal antiinflammatory drug." *Beebe v. Astru*e, No. 10-CV-01467 (MAD), 2012 WL 3791258, at *6 n.4 (N.D.N.Y. Aug. 31, 2012) (citation omitted).

[7] "Flexiril is a muscle relaxant utilized to treat painful muscle spasms." *Castagna v. Berryhill*, No. 16-CV-06908 (AJP), 2017 WL 3084903, at *5 n.5 (S.D.N.Y. July 20, 2017) (citation omitted).

[8] "Radiculopathy is a 'disease of the lumbar nerve roots.'" *McCleese v. Saul*, No. 18-CV-04494 (AT) (SDA), 2019 WL 3037308, at *2 n.8 (S.D.N.Y. June 26, 2019) (citation omitted), *report and recommendation adopted*, 2019 WL 3034892 (S.D.N.Y. July 11, 2019).

[9] "Myofasciitis or myofascial pain syndrome 'is a chronic pain disorder. In this condition, pressure on sensitive points in your muscles (trigger points) causes pain in the muscle and sometimes in seemingly unrelated parts of your body.'" *Abualteen v. Saul*, No. 19-CV-02637 (DF), 2020 WL 5659619, at *9 n.34 (S.D.N.Y. Sept. 23, 2020) (citation omitted).

evaluation with Dr. Schwartz. (*Id*.) In each of her visits, Dr. Schwartz noted that she was totally disabled from any and all work and noted similar findings and recommendations as her initial evaluation. (R. 409-10, 411-12, 421-22.) Dr. Schwartz prescribed Celebrex[10] for pain management at each visit, and made no mention of the prior prescriptions for Relafen and Flexiril. (R. 410, 412, 422.)

Vicens saw Dr. Schwartz on April 6, 2015, anxious and concerned regarding her ongoing exacerbations of pain, often severe, throughout her neck and lower back. (R. 362.) On the VAS, Vicens marked 55 mm as the point representing her current state of pain. (*Id*.) Dr. Schwartz once again noted that she was totally disabled from any and all work and noted similar findings and recommendations as at her previous evaluations. (R. 362-63.) Dr. Schwartz renewed her Celebrex prescription and encouraged her to receive steroid injections. (R. 363.)

Dr. Schwartz completed a Doctor's Report of MMI/Permanent Impairment for the New York State Workers' Compensation Board regarding Vicens' April 6, 2015 visit. (R. 439.) Dr. Schwartz reported that "she is suffering from a permanent total disability." (R. 440.) Describing her functional capabilities for any work, Dr. Schwartz assessed that she never would be able to kneel, bend, stoop, squat, drive a vehicle, operate machinery, work in extreme temperatures and unspecified environmental conditions, and only occasionally would be able to lift and carry up to 5 pounds, pull and push up to 5 pounds, sit, stand, walk, climb, grasp, reach overhead and reach at or below shoulder level. (R. 441.) As a result of his assessment, Dr. Schwartz found that she would be unable to meet the requirement of sedentary work. (*Id*.)

---

[10] "Celebrex is indicated for relief of the signs and symptoms of osteoarthritis, rheumatoid arthritis in adults, ankylosing spondylitis, and management of acute pain in adults." *Sweeting v. Colvin*, No. 12-CV-00917 (DNH) (CFH), 2013 WL 5652501, at *8 n.11 (N.D.N.Y. Oct. 15, 2013) (citation omitted).

Vicens's final follow-up evaluation with Dr. Schwartz during the relevant period occurred on June 5, 2015. (R. 475.) She complained of pain in the same areas as her previous visits, and that she was using Celebrex for pain management and awaiting receipt of a TENS unit.[11] (*Id*.) Dr. Schwartz once again noted that Vicens was totally disabled from any and all work and noted similar findings and recommendations as at her previous evaluations. (R. 475-76.)

### D.   Lenox Hill Radiology & Medical Imaging Associates

On June 20, 2013, Vicens underwent an MRI of the cervical and lumbar spine, and on June 24, 2013, she underwent an MRI of the thoracic spine at Lennox Hill Radiology & Medical Imaging Associates. (R. 364-67.) The MRI of the cervical spine showed large, predominantly right-side posterior disc herniation at C4-C5, compromising the canal and impinging the spinal cord; midline posterior disc herniation at C3-C4, impinging the spinal cord; disc space narrowing at C5-C6 and C6-C7 associated with broad based posterior disc protrusions/herniations, larger at C5-C6, compromising the canal; and mild reversal of the cervical lordosis. (R. 365-66.)

The MRI of the lumbar spine showed a midline posterior disc bulging encroaching upon the canal, but otherwise, the remainder of the intervertebral discs appeared within normal limits and the remainder of the canal appeared free of significant encroachment. (R. 367.) The MRI of the thoracic spine showed right anterolateral disc protrusion at T7-T8 but no posterior disc herniations or areas of stenosis of the thoracic canal or compression of the thoracic spinal cord. (R. 364.)

---

[11] "TENS refers to 'transcutaneous electrical nerve stimulation.' . . .  A TENS unit 'is a device that sends small electrical currents to targeted body parts. These currents are used to relieve pain.'" *Banks v. Comm'r of Soc. Sec.*, No. 19-CV-00929 (AJN) (SDA), 2020 WL 2768800, at *2 n.2 (S.D.N.Y. Jan. 16, 2020) (citations omitted), *report and recommendation adopted*, 2020 WL 2765686 (S.D.N.Y. May 27, 2020).

E.    **Dr. Steven D. Zaretsky**

On June 24, 2013, Vicens was evaluated by Dr. Zaretsky, an orthopedic surgeon, for the purpose of an Independent Medical Evaluation in connection with Vicens's workers' compensation claim. (R. 382-86.) Vicens complained of nightly pain to the lumbosacral and cervical spine; numbness, tingling and weakness involving the bilateral lower extremities; and localized neck and low back pain with Valsalva maneuvers. (R. 383.) She stated that she could sit for one hour, stand for two hours, walk three blocks, lift seven pounds, and that her neck, thoracic and low back pain was exacerbated with pushing and pulling. (*Id*.) She further mentioned that she had improved 25% since her injury and that she had been receiving physical therapy three times per week for four weeks. (R. 385.)

Dr. Zaretsky found normal cervical lordosis, lumbar lordosis and thoracic kyphosis, no atrophy of the upper extremities, as well as intact radial, ulnar and median nerves in the upper extremities. (R. 384-85.) Dr. Zaretsky opined that these findings were consistent with mild strain of the cervical and lumbosacral spine and that the injury was causally related to her accident. (R. 385.) He also opined that Vicens was magnifying her symptoms. (*Id*.)

Dr. Zaretsky recommended that she complete six weeks of physical therapy and then continue with a home exercise program. (*Id*.) Dr. Zaretsky concluded that Vicens had a temporary mild partial disability and that she was able to participate in gainful employment with light duty restrictions, described as exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently and/or a negligible amount of force constantly to move objects. (*Id*.)

Dr. Zaretsky examined Vicens again on September 9, 2013. (R. 372-75.) Vicens had been receiving physical therapy three times per week for the last two months and noted that she had

improved approximately 50%. (R. 372.) Vicens complained of similar pain as at her previous examination with Dr. Zaretsky. (R. 373.) Dr. Zaretsky presented findings similar to his previous evaluation, including that his findings were "consistent with symptom magnification." (R. 373-74.) Dr. Zaretsky recorded that there was no need for ongoing physical therapy or further diagnostic testing, as Vicens had reached maximum medical improvement and she was able to return to her prior level of employment without restrictions. (R. 374.) Dr. Zaretsky concluded that her prognosis was excellent. (*Id*.)

      **F.**    **Dr. Eugene J. Liu**

On August 23, 2013, Vicens visited Dr. Liu for an initial consultation, complaining of severe pain in the neck extending down to the bilateral upper extremities, numbness and tingling in the upper and lower extremities, thoracic pain primarily in the thoracolumbar junction, and back pain traveling down the lower extremities all the way to her toes. (R. 354-55.) Vicens's cervical area of pain was approximately 8-9/10 on intensity and she claimed physical therapy was not helping. (R. 354.) Dr. Liu's physical examination showed diffuse muscle spasms in both the cervical and lumbar area, tenderness to palpation to all paraspinal muscles, but not the posterior spinal processes in any of the three areas, and restriction of range of motion in the cervical area in all directions. (R. 355.) Dr. Liu found cervical disc herniations, lumbar disc herniation, thoracic disc protrusion, strain in all areas and cervical and lumbar radiculopathy. (*Id*.)

On July 10, 2014, Vicens saw Dr. Liu for a follow-up visit with continued neck and back pain, and recently pressing, radiating symptoms down to the right C5-C6 pattern and muscle spasms with local swelling. (R. 458.) Dr. Liu found a muscle spasm in the cervical paraspinal and lumbar paraspinous muscle group, limited range of motion in the neck and back, fullness and

swelling in the trapezius area on the right compared to the left, limited extension and side bending, light touch sensation of the upper extremity, trace tendon reflex and no gross muscle atrophy. (*Id.*)

On August 12, 2014, Vicens returned to Dr. Liu for another follow-up visit, complaining of pain in the lower and neck, with slightly more pain in the neck, with pain traveling down the upper extremity. (R. 459.) On examination, Dr. Liu found that Vicens showed muscle spasms in both cervical and lumbar paraspinal muscle groups, limited range of motion of the cervical area, upper and lower extremity strength, intact sensation and deep tendon reflexes with the exception of the upper extremities, and positive straight leg raising. (*Id.*) Dr. Liu found cervical and lumbar disc derangement, radicular feature symptom over the right upper extremity. (*Id.*) Dr. Liu requested a lumbar epidural steroid injection to reduce inflammation, symptoms and muscle spasms. (*Id.*)

Vicens next saw Dr. Liu on December 30, 2014, reporting "tremendous" improvement with symptom reduction and that she had an easier time with daily activities. (R. 445.) On examination, Dr. Liu noted muscle spasm in the paraspinous cervical area, stiff range of motion, limited extension and side bending, dull light touch sensation in the upper extremities, trace tendon reflexes, and normal grip strength. (*Id.*) Dr. Liu found that her injuries had improved with the cervical epidural injection; however, he noted complications due to her weight gain of 25 pounds. (*Id.*) Dr. Liu recommended that Vicens continue exercise therapy and use of medication and that she "[r]emain disabled and not working and reassessment in two months' time. (*Id.*)

Finally, Dr. Liu stated that he would "hold off on any further intervention" due to Vicens's weight gain. (*Id*.)

On March 12, 2015, Vicens returned to Dr. Liu frustrated because she felt that, although the one injection helped diminish her symptoms, she was still battling with increased weight gain since the date of the injection. (R. 446.) Vicens asked if she could participate in a home exercise program to help build strength and lose weight. (*Id*.)

### G.   Dr. Jerrold M. Gorski

On June 17, 2014, Dr. Gorski, an orthopedic surgeon, examined Vicens for an Independent Medical Examination in connection with her workers' compensation claim. (R. 461-62.) On examination, Dr. Gorski found that she had was able to raise her arms up fully, bend at the waist and bring her fingertips to the knees, but with complaints in the lower back while doing so. (R. 462.) Dr. Gorski concluded that she was at maximum medical improvement for her claim and she did not require any further causally related diagnostic testing, orthopedic treatment, physical therapy or medication. (*Id*.) Dr. Gorski noted that Vicens may have ongoing complaints, but they would be caused entirely by advancing age and degenerative changes. (*Id*.) His diagnosis was "of a temporary strain/sprain of the neck and back, now resolved." (*Id*.)

On March 3, 2015, Dr. Gorski conducted another Independent Medical Examination of Vicens. (R. 368-71.) At this time, she complained of neck, back and right elbow pain, with weakness in both legs. Dr. Gorski found normal gait and rhythm, a very low threshold for pain, and strong grip. (R. 370.) Dr. Gorski opined that Vicens was at maximum medical improvement. (*Id*.) He further opined that she "clearly is not indicated for any surgery." (*Id*.) Dr. Gorski found that she did not require any further diagnostic testing or treatment and that she was "capable of

gainful employment without objective causally related restrictions." (*Id.*) He also opined that Vicens was "carrying low threshold for pain and this [sic] embellishing." (*Id.*)

**H.      Dr. Demetrios Mikelis**

On January 12, 2015, Vicens saw Dr. Demetrios Mikelis complaining of constant neck and lower back pain. (R. 351-53.) Dr. Mikelis noted that her injury did not interfere with her daily normal function. (R. 351.) Upon examination, Dr. Mikelis observed tenderness, spasms and limited range of motion to the cervical spine and lumbar spine; reduced motor strength and sensation to the upper right extremities and lower extremities; and normal reflexes. (R. 352.) Dr. Mikelis diagnosed herniated cervical intervertebral disc; cervical nerve root impingement; thoracic herniated nucleus pulposus; and lumbar sprain, strain and radiculopathy. (*Id.*)

On April 1, 2015, Vicens returned to Dr. Mikelis for a follow-up visit complaining of back and neck pain, but with some improvement of pain. (R. 453-54.) Dr. Mikelis noted similar observations and diagnosis as her previous visit. (*Id.*) After discussing surgical and non-surgical treatments with Dr. Mikelis, Vicens selected to proceed with chiropractic care/physical therapy and epidural injections. (R. 454.) Dr. Mikelis noted that Vicens was to refrain from any activity that would exacerbate injuries, including heavy lifting, carrying and bending. (*Id.*)

**I.      Dr. Cheryl Archbald – Consultative Examination**

On March 14, 2016, Vicens visited Dr. Cheryl Archbald for a consultative examination. (R. 467-71.) Vicens complained of constant neck and back pain with fractured discs in the thoracic and lower back. (R. 467.) Vicens noted her back pain was worse in cold weather and that it hurt daily to bend, walk and sit. (*Id.*) Vicens stated she could clean and cook but her husband did the heavy lifting. (R. 468.) During the examination, Vicens deferred doing cervical spine flexion,

lateral flexion on the left side and lumbar spine flexion due to concern of pain. (R. 469.) On examination, Dr. Archbald assessed moderate limitations for squatting, lifting and carrying; marked limitations for bending, cervical spine flexion, looking down and turning her head to the left on lateral rotation; and mild limitations with kneeling and climbing stairs. (R. 470.) Dr. Archbald noted that Vicens should limit activities involving fine visual acuity. (*Id*.)

### J.    Dr. Andrew Gitkind

On March 14, 2018, Vicens saw Dr. Gitkind, a physical medicine and rehabilitation specialist, citing back and neck pain. (R. 701-20.) Dr. Gitkind observed chronic bilateral thoracic back pain and discussed the importance of daily exercise and postural training with Vicens. (R. 709.) Dr. Gitkind noted that he was going to start her on a course of physical therapy. (*Id*.)

On August 22, 2018, Vicens saw Dr. Gitkind complaining mainly of neck pain and that she was feeling somewhat better and moving more freely since a chiropractor gave her an adjustment. (R. 743.) Dr. Gitkind noted mostly myofascial pain in the upper back and neck with multiple painful trigger points in the right trapezius. (R. 750.)

### K.    Dr. Sam J. Yee

On April 26, 2018, on referral from Dr. Gitkind, Vicens saw Dr. Yee, complaining of neck, thoracic and lower back pain. (R. 544.) Upon examination, Dr. Yee noted that palpation of the cervical, lumbar and thoracic spine showed tenderness, reduced abduction in the shoulders, and reduced flexion and extension in the elbows, wrists and hands. (R. 544-45.) Dr. Yee assessed cervical radiculopathy, lumbar radiculopathy, thoracic spondylosis without myelopathy and left tennis elbow, and recommended physical therapy. (R. 546.)

Vicens returned to Dr. Yee on July 21, 2018, complaining of the same ongoing as her previous visit, plus increasing pain in her elbow. (R. 553-56.) Dr. Yee observed that palpation of the cervical spine, thoracic and lumbar spine showed tenderness. (R. 554-55.) Dr. Yee noted that Vicens had exhausted all her allotments for restorative physical therapy for the year and reinforced a home exercise program. (R. 556.)

**L.**     **Stand-Up MRI Of The Bronx, P.C.**

On June 25, 2018, an x-ray on Vicens's left elbow was performed at Stand-Up of the Bronx, P.C. (R. 567-68.)  The x-ray showed no evidence of acute osseous pathology, suspected abnormal soft tissue mineralization adjacent to the lateral epicondylar region (with the possibility of calcific tendinitis-related change playing a role in the finding) and slight prominence to the posterior elbow soft tissues (with the possibility of olecranon bursitis playing a role in the finding). (*Id*.)

On July 19, 2018, an MRI was performed on Vicens's left elbow. (R. 569-70.) The MRI showed common extensor tendinopathy with an 8-mm moderate-grade partial tear at the humeral origin and joint effusion with no fracture. (*Id*.)

**M.**     **Dr. Jonathan Kazdan**

On August 15, 2018, Vicens attended an initial consultation with Dr. Kazdan, a chiropractor, complaining of neck and upper back pain with radiation into the shoulder and upper chest. (R. 532-33.) On examination, Dr. Kazdan found spasm and tenderness of the paralumbar muscles, paracervical muscles and trapezius muscles. (R. 532.)

Vicens followed up with Dr. Kazdan on August 18, 2018, 24, 2018 and August 27, 2018 and, during both visits, Dr. Kazden noted similar findings as her initial consultation. (R. 533-36.)

## IV.   <u>Administrative Hearing</u>

At the administrative hearing on September 25, 2018, Plaintiff testified that she lived in a house with her husband and his 26-year-old daughter. (R. 107-08.) She cooked and prepared meals three times daily, but claimed to do no other household chores. (R. 118.) She testified that she used public transportation. (R. 114.)

Plaintiff testified that she was injured at work trying to transfer a very large patient, and her impairment stems from this. (R. 105-06.) Plaintiff testified that she could no longer work because she could not stand "for long periods," her neck was "twisted in an abnormal position," walking made her tired, and she experienced pain in her lower back and legs, especially the right leg. (R. 114.) She stated that it was difficult to sit for long periods, but that she could more easily tolerate sitting if she wore a therapeutic belt. (R. 115.) When wearing the belt, she could sit for an hour at a time, followed by a 10 to 15 minute break. (*Id*.) Plaintiff also stated that she had issues with her left elbow, estimating that she could lift no more than 3 pounds. (R. 118.)

Plaintiff testified that Celebrex improved her pain, but caused her to have an upset stomach. (R. 117.) Physical therapy also helped. (R. 118.) She tried injection treatment for her left elbow, but testified that she stopped after having a negative reaction to anesthesia. (R. 118-19.)

Vocational expert ("VE")  Michelle Pagella testified that Plaintiff had past work as a home health aide (DOT #354.372-014), cleaner (DOT #323.682-014) and sales associate (DOT #290.477-014). (R. 120-21.) VE Pagella testified that an individual with Plaintiff's age, education and work

experience, with the ALJ's residual functional capacity ("RFC") determination,[12] could not perform any of Plaintiff's past work, but could perform other work as an assembler (DOT #706.687-010), bench packager (DOT #559.687-074) and sorter (DOT #222.687-022). (R. 122.) If such an individual were only able to flex their neck occasionally, there would be no light or sedentary jobs that they could perform. (*Id*.) If such an individual were not able to bend or stoop, the light positions would be eliminated. (R. 124.)

## V.   ALJ  Sherrard's Decision And Appeals Council Review

Following the five-step process, *see infra* Legal Standards Section II, ALJ Sherrard determined that Plaintiff did not have a disability within the meaning of the Act. (R. 83-94.) The ALJ found at step one that she had not engaged in substantial gainful activity during the period from her alleged onset date to the date of her decision. (R. 85.) At step two, the ALJ determined that Plaintiff had the following severe impairments: right anterior disc protrusion at T7-T8, disc herniations at C3-C4 and C4-C5 impinging on the spinal cord, disc space narrowing at C5-C6 and C6-C7 with C5-C6 disc protrusion, mild reversal of the cervical lordosis, disc space narrowing and spondylosis at C4-C5 and C6-C7, and obesity. (*Id*.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 86.)

The ALJ then assessed Plaintiff's RFC.[13] (R. 93-94.) ALJ Sherrard found that although the "objective findings support[ed] the allegations of some limitations," there was "little support for

---

[12] The hypothetical given to the VE was identical to the RFC cited in the ALJ's decision (*see* n.13, *infra*), except that it was somewhat more restrictive, in that it limited Plaintiff to standing and/or walking for four, rather than six, hours. (R. 90-91, 121.)

[13] The RFC limited Plaintiff to sitting for 6 hours, standing and/or walking for 6 hours, lifting and carrying 20 pounds occasionally and 10 pounds frequently; never climbing ladders, ropes, or scaffolds; occasionally

the extreme restrictions outlined by" Plaintiff. (R. 87.) The ALJ gave little weight to the opinion of Dr. Schwartz from April 2015 that Plaintiff would be able to perform less than sedentary work, among other reasons, because his physical exam findings were inconsistent with other medical evidence, including evaluations by other physicians, and because his findings of extreme limitations were inconsistent with his unchanged basic medication management over the course of the relevant period. (R. 89; R. 90-91.) The ALJ also found that, at the time that he issued his decision, Dr. Schwarz's April 2015 report was "over three years old and [that] new evidence show[ed] clear improvement in functioning." (R. 91.)

ALJ Sherrard gave some weight to the opinion of Dr. Zaretsky[14] that Plaintiff had only a temporary mild partial disability, that she would be capable of light work and that she would be able to return to her prior level of employment without restrictions. (R. 89.) The ALJ found that Dr. Zaretsky , who was a specialist in the field of orthopedic surgery, was a disinterested observer who had examined Plaintiff several times and that his opinion was consistent with that of Dr. Gorski (discussed *infra*). (*Id*.)

The ALJ gave no weight to the opinion of Dr. Liu, who stated that Plaintiff  "remain[ed] disabled." (R. 91.) The ALJ explained that Dr. Liu's opinion was "vague and not supported by the record" since Vicens was "clearly capable of some functioning." (*Id*.) In addition, the ALJ noted

---

climbing ramps and stairs, stooping, crouching, kneeling, crawling, and balancing; frequently reaching in all directions with the bilateral upper extremities; and frequently flexing and rotating the neck to the left. (R. 86-87.) The RFC further specified that Plaintiff would have no exposure to hazards, including unprotected heights and exposed moving mechanical parts. (R. 87.)

[14] The ALJ misspelled Dr. Zaretsky's surname as "Zaretski." (*See* R. 89.)

that "several other examining physicians found [Plaintiff] was capable of greater functioning than Dr. Liu and their findings [were] supported by the objective evidence." (*Id*.)

ALJ Sherrard gave some weight to the opinion of Dr. Gorski that Plaintiff was at maximum medical improvement and that she would be capable of light work. (R. 89.) The ALJ noted that Dr. Gorski was a specialist in the field of orthopedic surgery and that his opinions were consistent with those of Dr. Zaretsky (discussed supra). (*Id*.)

The ALJ gave some weight to the opinion of Dr. Mikelis from early 2015 that Plaintiff should refrain from heavy lifting, carrying and bending. (R. 90.) However, the ALJ found Dr. Mikelis's terminology to be vague and that Dr. Mikelis was not familiar with the three years of records were submitted since Dr. Mikelis's opinion, including those that have shown improvement with treatment. (*Id*.)

ALJ Sherrard gave little weight to the March 2016 opinion of Dr. Archbald, the consultative examiner, that Plaintiff would have moderate limits on squatting, lifting and carrying; marked limits on bending, cervical spine flexing, looking down and turning her head to the left on lateral rotation; and mild limits kneeling and climbing stairs. (R. 90.) The ALJ found that Dr. Archbald's opinion was not fully supported by her examination of Plaintiff, that Dr. Archbald had seen Plaintiff only once and that Dr. Archbald's findings were not consistent with treatment notes that came thereafter. (*Id*.)

Based on the RFC, the ALJ concluded at step four that Plaintiff could not perform her past relevant work. (R. 91-92.) At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. (R. 93.) Thus, the ALJ concluded that she was not disabled. (R. 94.)

Following the ALJ's November 16, 2018 decision, Plaintiff sought review from the Appeals Council, which denied her request on September 24, 2019. (R. 68-71.)

## LEGAL STANDARDS

### I.    Standard Of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does [the Court] determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejeda v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448

(2d Cir. 2012)) (internal quotation marks omitted). If the findings of the Commissioner as to any

fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d

307, 312 (2d Cir. 1995).

## II.    **Determination Of Disability**

A person is considered disabled for benefits purposes when she is unable "to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if [the combined
> effects of] [her] physical or mental impairment or impairments are of such severity
> that [she] is not only unable to do [her] previous work but cannot, considering
> [her] age, education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless of whether such
> work exists in the immediate area in which [she] lives, or whether a specific job
> vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A).

In determining whether an individual is disabled, the Commissioner must consider:

"(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts;

(3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the

claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d

1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating

disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. § 404.1520(a)(4).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. *See* 20 C.F.R. § 404.1520(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.*

21

III.  **The Treating Physician Rule**[15]

An ALJ must follow specific procedures "in determining the appropriate weight to assign

a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). "First, the ALJ

must decide whether a treating physician's opinion is entitled to controlling weight." *Id.* The ALJ

must give "controlling weight" to the opinion of a claimant's treating physician as to the nature

and severity of the impairment as long as it "'is well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. §

404.1527(d)(2)); *see also Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not

afforded controlling weight where . . . the treating physician issued opinions that are not

consistent with other substantial evidence in the record, [including] the opinions of other medical

experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the

ALJ must determine how much weight, if any, to give it. *Estrella*, 925 F.3d at 95.  "Even if the

treating physician's opinion is contradicted by other substantial evidence, and so is not

controlling, it may still be entitled to significant weight 'because the treating source is inherently

more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of*

*Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir.

---

[15] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claims were filed before that date, to the extent that the regulations regarding medical opinion evidence are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017.

1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following, nonexclusive factors: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted).

At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them."). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed," the Court should affirm. *Id.* (citing *Halloran*, 362 F.3d at 32).

## DISCUSSION

Plaintiff argues that her case should be remanded to the SSA because: (1) the ALJ failed to properly evaluate Listing 1.04(A) in circumstances where substantial evidence supports the proposition that Plaintiff meets this Listing due to her cervical impairments; and (2) the ALJ failed to comply with the treating physician rule with respect to Dr. Schwartz in determining Plaintiff's RFC. (Pl.'s Mem., ECF No. 15, at 1, 9-20.) In opposition to Plaintiff's motion, and in support of his cross-motion, the Commissioner argues that substantial evidence supports the ALJ's conclusion that Plaintiff did not demonstrate that she met or equaled a listed impairment and that the ALJ

complied with the treating physician rule and gave good reasons for the weight accorded to Dr. Schwartz's opinion. (Comm'r Mem., ECF No. 21, at 1, 15-25.)

The Court considers the two grounds argued by Plaintiff in turn.

**I.**   **Substantial Evidence Supports the ALJ's Conclusion that Plaintiff's Impairments Did Not Meet or Equal the Requirements of Listing 1.04(A)**

If an ALJ determines a plaintiff has a severe mental or physical impairment at step two of the disability evaluation procedure, the ALJ then must determine at step three whether the impairment meets the criteria of any impairment listed in Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii)(d).[16] The impairments listed in Appendix 1 are considered severe enough to prevent a plaintiff from doing any gainful activity. *Id*. § 404.1525(a). If a plaintiff's impairment, or combination of impairments, matches one listed in Appendix 1, and satisfies the duration requirement, then the ALJ generally should find the plaintiff disabled without considering the plaintiff's age, education and work experience. *Id*. § 404.1520(d).

To match an impairment listed in Appendix 1, a plaintiff's impairment "must meet all of the specified medical criteria" of a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (citing 20 C.F.R. § 404 Subpt. P, App. 1). It is the plaintiff's burden to "demonstrate that [her] disability [meets] all of the specified medical criteria of [a Listing]." *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x. 887, 888 (2d Cir. 2007) (internal citations omitted). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530. The question for this Court is whether substantial evidence supported the ALJ's conclusion that Plaintiff's

---

[16] Effective March 27, 2017, many of the regulations cited herein have been amended, as have Social Security Rulings ("SSRs"). Nonetheless, because Plaintiff's application was filed before the new regulations and SSRs went into effect, the Court reviews the ALJ's decision under the earlier regulations and SSRs.

impairments do not meet or medically equal the impairments listed in the regulations. *See Johnson v. Astrue*, 563 F. Supp. 2d 444, 458 (S.D.N.Y. 2008).

In the present case, Listing 1.04(A), which relates to disorders of the spine, is the relevant Listing. Under Listing 1.04(A), a claimant is presumptively disabled if she has "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture[], resulting in compromise of a nerve root . . . or spinal cord" with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). "To meet a listed impairment, a claimant must demonstrate that he or she suffers from all of the listed criteria, no matter how severe any one particular element of the listing may be." *Conetta v. Berryhill*, 365 F. Supp. 3d 383, 398 (S.D.N.Y. 2019).

With respect to Listing 1.04, the ALJ stated: "Imaging showed the claimant's cervical disc herniation to be impinging on the spinal cord. But there is no evidence of atrophy, sensory deficits, or reflex loss due to her cervical or thoracic issues. The claimant's musculoskeletal impairments do not meet or equal listing 1.04." (R. 86.) While Plaintiff is correct that there is no requirement of atrophy, just muscle weakness (*see* Pl.'s Mem. at 11 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A ("atrophy with muscle weakness or muscle weakness")), there is substantial evidence in the record to support that ALJ's finding that Plaintiff's musculoskeletal impairments do not meet or equal Listing 1.04. (*See*, *e.g.*, R. 355 (intact strength, sensation and reflexes noted by Dr. Liu in August 2013); R. 370 (negative straight leg raising noted by Dr. Gorski

in March 2015); R. 379 (intact sensation and reflexes noted by PT Llaurado in May 2013); R. 384 (intact sensation noted by Dr. Zaretsky in June 2013); R. 408 (full strength and intact sensation noted by PA Behrens in May 2013); R. 430 (normal reflexes and sensation noted by PT Llaurado in June 2014); R. 446 (intact strength noted by Dr. Liu in March 2015); R. 459 (intact strength and sensation noted by Dr. Liu in August 2014); R. 462 (no motor or sensory deficits and negative straight leg raising noted by Dr. Gorski in June 2014); R. 469-70 (intact sensation and full strength noted by Dr. Archbald in March 2016); R. 544-45 (normal sensation and reflexes and negative straight leg raising noted by Dr. Yee in April 2018); R. 555 (normal sensation and reflexes and negative straight leg raising noted by Dr. Yee in July 2018); R. 707-08 (normal strength, reflexes and sensation noted by Dr. Gitkind in March 2018); R. 749-50 (normal strength, reflexes and sensation noted by Dr. Gitkind in August 2018).) Although evidence in the record indicated Plaintiff's spinal impairments met some criteria of Listing 1.04(A),[17] "that does not alter the fact that substantial evidence exists to support the ALJ's conclusion[.]" *Conetta*, 365 F. Supp. 3d at 398.

Moreover, even though that portion of the ALJ's decision addressing step three was abbreviated, other portions of his decision reflect that he was aware of and considered the foregoing evidence. Specifically, in his RFC discussion, the ALJ notes that Plaintiff's examinations "regularly showed normal strength and reflexes in the extremities" and "no motor or sensory deficits." (R. 87.) Thus, the Court finds that there is substantial evidence to support the ALJ's conclusion at step three. *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010)

---

[17] *See, e.g.*, R. 409, 411, 418 (diminished sensation and reflexes noted by Dr. Schwartz in June 2013, January 2014 and April 2014); R. 445-46, 458 (diminished sensation noted by Dr. Liu in July 2014, December 2014 and March 2015).

(even the "absence of an express rationale for an ALJ's conclusions [at step three] does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence'" (citation omitted)); *Johnson*, 563 F. Supp. 2d at 458; *see also Gonzalez v. Saul*, No. 19-CV-02317 (JLC), 2020 WL 5550043, at *21 (S.D.N.Y. Sept. 16, 2020) ("Despite the lack of a detailed explanation given by the ALJ, substantial evidence supports the conclusion that [the plaintiff] did not meet Listing 1.04A.").

II.     **The ALJ's Assessment of Dr. Schwartz's Opinion Complied with the Treating Physician Rule**

Plaintiff argues that the ALJ violated the treating physician rule because he gave little, rather than controlling, weight to the opinions of Plaintiff's treating physician, Dr. Schwartz, without good reasons for doing so. (*See* Pl.'s Mem. at 14-20.) The Commissioner argues that the ALJ is not required to give controlling weight to a treating source's medical opinion that is not supported by medical evidence or is contradicted by other substantial evidence in the record, and that the ALJ gave good reasons for the weight assigned. (*See* Comm'r Mem. at 1, 20-22.) For the reasons set forth below, the Court finds that the ALJ's assessment of Dr. Schwartz's opinion complied with the treating physician rule and her decision to afford Dr. Schwartz's opinion little weight is supported by substantial evidence.

As set forth in Legal Standards Section III, *supra*, a treating physician's opinion is only entitled to controlling weight if it is well-supported and not inconsistent with other substantial evidence in the record. *See Halloran*, 362 F.3d at 32. Here, the ALJ determined that the physical examination findings of Dr. Schwartz were "significantly more limited than the findings of any other examiner during this time" and inconsistent with other evidence in the record. (R. 88, 90.)

The ALJ cited to a contemporaneous assessment by Dr. Mikelis, which documented greater flexion, extension and rotation in the cervical and lumbar spine than that assessed by Dr. Schwartz. (R. 88 (citing 453-54).) Plaintiff argues that many of Dr. Mikelis's findings are consistent with those of Dr. Schwartz (Pl.'s Mem. at 16), but that does not mean that the ALJ could not consider their different conclusions regarding range of motion. Indeed, the ALJ recognized other evidence in the record that Plaintiff had range of motion limitations, but to a lesser degree than suggested by Dr. Schwartz. (R. 87-88.) The ALJ also discussed other examination findings from the same period that showed, among other things, normal strength and reflexes, which were inconsistent with the findings of Dr. Schwartz. (*Id*.)

In explaining the weight assigned to Dr. Schwartz's decision, the ALJ recognized the length and nature of his treatment relationship with Plaintiff, but found his exam findings inconsistent with other evidence in the record, including evaluations by other physicians. (R. 88-90.) In addition to Dr. Mikelis, the ALJ gave greater weight to the opinions of Dr. Gorski and Dr. Zaretsky. (R. 89-90.) Dr. Gorski saw Plaintiff twice, *i.e*., in June 2014 and in March 2015, and found she was capable of returning to work with restrictions and that she only had suffered from a "temporary strain/sprain" or sprain of the neck and back in September 2012 that had "resolved." (R. 370, 462.) Dr. Zaretsky also saw Plaintiff twice, *i.e*., in June 2013 and September 2013. (R. 372-75, 382-86.) He found a mild strain of Plaintiff's cervical and lumbrosacral spine and that Plaintiff was magnifying her symptoms. (R. 374, 385.) The opinions of independent medical examiners like Dr. Gorski and Dr. Zaretsky can be substantial evidence to justify an ALJ assigning less-than-controlling weight to a treating physician's opinion. *See Conetta*, 365 F. Supp. 3d at 403-04 (ALJ did not err in giving significant weight to opinions of independent medical examiners, rather than

treating physician, where consideration of examiners' opinions was only part of ALJ's analysis of record); *see also Mongeur*, 722 F.2d at 1039 ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial  evidence, and the report of a consultative physician may constitute such evidence." (citations omitted)); *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (we "accept the weight assigned to . . . inconsistent opinions as a proper exercise of the ALJ's discretion").

The ALJ also found that Dr. Schwartz's opinions were inconsistent with later records showing that Plaintiff has improved with physical therapy and inconsistent with her "unchanged basic medication management" during the relevant period. (R. 90-91.) The opinion of a treating physician is not 'to be discounted merely because he has recommended a conservative treatment regimen,'" *Cabrera v. Comm'r of Soc. Sec.*, No. 16-CV-04311 (AT) (JLC), 2017 WL 3686760, at *4 (S.D.N.Y. Aug. 25, 2017) (quoting *Burgess*, 537 F.3d at 129)), though it may be considered a factor. *See Tricarico v. Colvin*, 681 F. App'x 98, 100-01 (2d Cir. 2017) (substantial evidence supported ALJ's decision not to accord controlling weight to treating physician's assessment because, *inter alia*, "the extreme limitations [the treating doctor] identified were not consistent with the relatively conservative treatment plan he had prescribed"). Nor is evidence of improvement necessarily enough to override the opinion of a treating physician. *See, e.g., Martinez v. Saul*, No. 19-CV-01017 (TOF), 2020 WL 6440950, at *11 (D. Conn. Nov. 3, 2020). Nonetheless, these were not the only reasons provided by the ALJ and, considering the record as a whole, I find that the substance of the treating physician rule was not traversed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is DENIED and the Commissioner's cross-motion is GRANTED. The Clerk of Court is respectfully requested to close this case.

Dated:      February 5, 2021
              New York, New York

**STEWART D. AARON**
**United States Magistrate Judge**